FILED
COURT OF APPEALS
DIVISION II

2013 SEP -4 AM 10: 15

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| DALE E. and LETA L. ANDERSON; DALE E. ANDERSON and LETA L. ANDERSON, Trustees of the DALE E. ANDERSON AND LETA L. ANDERSON FAMILY TRUST; and RIVER PROPERTY LLC, <br><br> Respondents/Cross Appellants, <br><br> v. <br><br> JAMES W. BROWN; ROBERTA D. DAVIS; KAE HOWARD, Trustees of the KAE HOWARD TRUST; MICHAEL J. and CRISTI D. DEFREES, husband and wife; TUAN TRAN and KATHY HOANG, husband and wife; THOMAS J. and GLORIA S. KINGZETT, husband and wife; LARRY R. and SUSAN I. MACKIN, husband and wife; TOD E. MCCLASKEY, JR. and VERONICA A. MCCLASKEY, Trustees of the MCCLASKEY FAMILY TRUST-FUND A; CRAIG STEIN; RICHARD and CAROL TERRELL, husband and wife, <br><br> Appellants/Cross Respondents. | No. 41201-2-II <br> consolidated with <br> No. 42925-0-II <br><br><br><br> UNPUBLISHED OPINION |

PENOYAR, J. — Dale and Leta Anderson seek to divide a lot they purchased in a Vancouver riverfront subdivision. The other lot owners in the subdivision oppose the division of this lot, having signed an amendment to the subdivision's restrictive covenants that forbids further division of any lot. After the superior court entered a declaratory judgment that the amendment was invalid and that the existing covenants did not expressly forbid or allow further divisions of subdivision lots, the Andersons filed a short plat application with the city that received preliminary approval.

The neighbors filed two separate appeals, one challenging the superior court's declaratory ruling and one challenging the hearing examiner's decision affirming the city's approval of the Andersons' short plat application. These two appeals have been consolidated here and present numerous issues.

We conclude that the amendment to the covenants was valid because, in conformance with the covenants, it was approved by owners holding more than 80 percent of current ownership interest in the lots in the subdivision. This conclusion renders moot issues the neighbors raise of exhaustion of administrative remedies and the propriety of the declaratory judgment proceedings. We also conclude that the Andersons' equitable claims must be remanded for further proceedings. We retain jurisdiction so that, should the Andersons be successful in these proceedings, we may consider whether the Andersons' application will need to be processed as a plat alteration or as a short plat. Finally, the Andersons were not entitled to attorney fees below, nor is either party entitled to attorney fees on appeal, because neither party is of yet the prevailing party in this dispute. Accordingly, we reverse in part, and remand with jurisdiction retained.

FACTS

*CASE ONE*

I.    BACKGROUND

In 1989, the Rivershore phase 1 subdivision (Rivershore) was created along the banks of the Columbia River near Vancouver, Washington.[1] When it was recorded, Rivershore comprised 13 lots and a tract of land called Tract A that, running the length of the subdivision, bordered each lot on one side and the river on the other. Note 4 on the Rivershore plat stated: "Tract 'A'

---

[1] The City of Vancouver annexed Rivershore and the surrounding area in January 1997.

2

to be owned and maintained by owners of record of lots 1-13; will be conveyed as an undivided 1/13 interest in, and to tract 'A.'" Clerk's Papers (CP) at 608.

Rivershore's developer created and recorded a declaration of covenants and restrictions for Rivershore (Covenants) at the time of Rivershore's creation. The Covenants' introduction provides for their amendment: "[A]ny modification desired may be made by affirmative vote of 80% of the then owners of lots within this subdivision and evidenced by a suitable instrument filed for public record." CP at 16.

The Covenants also detail the rights, responsibilities, and restrictions associated with Tract A. Mirroring the language of note 4 on Rivershore's plat, the Covenants' section 15 states: "Tract 'A' of tidelands to be owned and maintained by owners of record of lots 1 through 13, and shall be conveyed to each as an undivided 1/13th interest in and to Tract 'A'." CP at 19. In section 16, the Covenants state:

> It is intended that the use and enjoyment of said Parcel "A" be restricted to the owners of Lots 1 through 13 and the future owners of lots contained within the boundaries of Tax Parcels 122364, 122365 and 500742.[2]

CP at 19.

The Covenants' Section 19 addresses the effect of failure to enforce the Covenants:

> The failure on the part of any said parties affected by these restrictions at any time to enforce any of the provisions hereof shall in no event be deemed a waiver thereof, or any thereof, or of any existing violation thereof, nor shall the covenants and restrictions by judgment of court order affect any other provisions hereof, which shall remain in full force and effect.

CP at 20. Section 19 also addresses awarding attorney fees for actions brought to enforce the Covenants:

---

[2] These tax parcels refer to other subdivisions outside Rivershore.

3

> Should any suit or action be instituted by any of said parties to enforce any of said reservations, conditions, agreements, covenants and restrictions, or to restrain the violation of any thereof, after demand for compliance therewith or for the cessation of such violation, events and whether such suit or action be entitled to recover from the defendants therein such sum as the court may adjudge reasonable attorney fees in such suit or action, in addition to statutory costs and disbursements.

CP at 20.

In 1990, Dale and Leta Anderson purchased lot 4 of Rivershore.[3] In 2002, James Brown, the owner of lot 13 of Rivershore, filed an application with the City of Vancouver (City) to short-plat his lot into two separate parcels. The Andersons, along with several of their neighbors, objected to Brown's proposed short plat; the attorney for the Andersons and these neighbors wrote to a City planner delineating their objections. Among these objections was that Brown's short plat would violate sections 1, 15, and 16 of the Covenants.[4] The City planner disagreed: "If the authors of the CC&Rs [the Covenants] had intended to limit the number of lots within Rivershore Phase 1 to the original 13, they could have clearly stated this." CP at 25. Furthermore, the City planner added that "the city does not enforce CC&Rs. These are private restrictions adopted by a developer or homeowners' association." CP at 25.

The City approved Brown's short plat. In the short plat, Brown addressed the 1/13th interest that lot 13 had in Tract A, dividing the interest equally so that the owner of each of the two new lots had a 1/26th interest in Tract A. None of the Rivershore lot owners filed any formal legal objection to the short plat, and the plat became final. After the short plat, Brown

---

[3] The Andersons, as trustees, purchased this lot for the Dale E. Anderson and Leta L. Anderson Family Trust.

[4] Another objection was that RCW 58.17.215 required Brown to submit a plat alteration for the changes he had proposed for lot 13.

4

occupied one of the two new lots and offered the second for sale. The Andersons purchased that second lot in 2005.[5]

In 2008, the Andersons purchased lot 2 of Rivershore.[6] The Andersons intended to short-plat lot 2, employing the services of Planning Solutions, Inc. Under the proposed short plat, lot 2, which already had a single family home on it, would be divided as an "infill" project into two lots, each with a single family home. CP at 84. Before submitting their short plat application to the City, the Andersons submitted their short-plat plans to the City for preliminary review. The City scheduled a pre-application conference for September 18, 2008, to address the proposed short plat.

Meanwhile, Rivershore's other lot owners (Neighbors) opposed the Andersons' proposed short plat of lot 2. On September 15, 2008, the respective owners of lots 1, 3, 5-12, and lot 1 of former lot 13 (still owned and occupied by Brown) signed an amendment to the Covenants, adding the following restriction to the end of section 1 and stating that it was effective immediately: "Lots 1 through 13, consisting of the original 13 lots contained in Rivershore, shall not be further subdivided or short platted." CP at 42. The amendment—accompanied by the Neighbors' notarized signatures—was recorded the following month.

The attorney for one of the Neighbors submitted a letter dated September 18, 2008, to a City senior planner, "to make abundantly clear that the intent has always been for lots within Rivershore not to be subdivided, over 80 percent of the Rivershore lot owners recently amended

---

[5] The Andersons made this purchase through River Property, LLC, a company they organized and of which they are the sole owners.

[6] The Andersons effectively own three lots within Rivershore: lot 2 personally, lot 4 in trust, and lot 2 of former lot 13 through their LLC. Rather than referring alternately to the trust, the LLC, and the Andersons personally, we use "the Andersons" generally to refer to the owners of these three lots.

5

the Declaration [the Covenants], as authorized by the original Declaration at page 1." CP at 33. In this same letter, the Neighbors argued that the City's decision to allow Brown's short plat contravened the original Covenants' clear intent and that this prior decision should not impact the City's decision regarding the Andersons' proposed short plat. Accordingly, the Neighbors argued that the Andersons' proposed short plat would violate not only the Covenants' new amendment, but also the original Covenants themselves. Finally, the Neighbors argued that the proposed short plat constituted a subdivision "alteration" under RCW 58.17.215, which mandates that, because this alteration would violate the Covenants, all the lot owners within the subdivision must agree in writing to the alteration.

In December, an assistant City attorney sent a letter to the Andersons' and the Neighbors' respective counsel, summarizing the City Attorney's Office's conclusion:

> [W]e believe the short plat should be denied and the applicant advised to submit a plat alteration application or a plat alteration with a separate short plat application. In order for the plat alteration to be approved, the applicant must obtain the agreement of all of the property owners providing that they agree to terminate or alter paragraphs 15 and 16 of the CC&R's to allow additional undivided ownership of Tract A.

CP at 45. The assistant City attorney noted that he had "advised [the City's] Development Review Services to deny the short plat application." CP at 48.

II.   PROCEDURE

The Andersons did not proceed with the short plat application and, instead, filed a complaint for declaratory relief in Clark County Superior Court in April 2009. In their complaint, the Andersons specifically sought a "[d]eclaratory judgment that neither the original Covenants nor the alleged 'Amendment' preclude [the Andersons] from short-platting their

6

properties."[7] CP at 3. After the Neighbors answered and asserted their affirmative defenses,[8] the Andersons moved for summary judgment with respect to their request for declaratory relief.

The Neighbors cross-moved for summary judgment, but they requested a continuance to allow further discovery regarding Rivershore's creators' intentions with respect to Rivershore's original plat and Covenants. The trial court denied the continuance. In April 2010, the trial court granted in part the Andersons' motion for summary judgment, ruling that (1) it had authority under the Uniform Declaratory Judgments Act[9] to grant the declaratory relief requested; (2) the original Covenants and plat of Rivershore "do not address the further subdivision of any lot in Rivershore," adding that "[t]he decisions of this court in this regard are not controlling on any determination that may be made on any particular short plat application that maybe [sic] determined by the City of Vancouver"; (3) the amendment to the Covenants was invalid because 80 percent of the "'then owners of Lots within said subdivision'" had not approved it; and (4) the Andersons' action was not prohibited for failure to exhaust administrative remedies because they did not have a short plat application pending before the City at that time. CP at 267.

The trial court also ruled, however, that (1) under the Covenants' section 19, the Neighbors, having failed to formally object to Brown's short plat, had not waived their rights to challenge the Andersons' proposed short plat; (2) the trial court could not grant the Andersons summary judgment on their claim of estoppel because of insufficient information and a material

---

[7] The Andersons also sought "[s]uch other relief as the Court may deem to be just and equitable" and an award of legal fees and costs. CP at 3.

[8] Brown defended against the Andersons' action separately from the other neighbors. Unless noted otherwise, however, "the Neighbors" includes Brown.

[9] Ch. 7.24 RCW.

7

issue of fact; and (3) "[t]he [Neighbors] did not abandon[ ] their rights under the original covenants by permitting or acquiescing to the use and existence of the two Lots created as a consequence of [Brown's] short plat of Lot 13." CP at 268.

The Andersons moved for clarification or reconsideration. The Neighbors also moved for reconsideration. The trial court denied these motions. The trial court also denied the Andersons' request for attorney fees. The Neighbors timely appeal.

*CASE TWO*

I.   BACKGROUND

In September 2010, a little over a week after the Neighbors' first appeal to this court, the assistant City attorney sent a letter to the Andersons' and Neighbors' respective counsel. In the letter, he informed counsel that "[i]n light of the [Superior] Court's decision, the City will accept a short plat application and process it without the requirement of a plat alteration." CP at 763.

II.   PROCEDURE

In November 2010, the Andersons submitted an application to the City to short plat lot 2 into two parcels. In April 2011, City staff issued its report and decision, granting preliminary plat approval with conditions. Later that month, the Neighbors timely appealed this decision, arguing, among other things, that the Andersons' application should be processed not as a short plat, but as a plat alteration.

In providing its report and recommendation to the hearing examiner, City staff noted that "[i]n light of the unique nature of this case," in which the examiner would have "to consider the operation of Washington subdivision laws, the effect of CC&R's, and a decision of the Clark County Superior Court," the staff would be "taking a rare neutral position in this appeal." CP at 447. Accordingly, City staff simply recommended the following: "Issue a decision based on the

8

record giving due consideration to the decision of the Clark County Superior Court dated April 8, 2010, and other materials submitted by the parties to this appeal." CP at 445.

After a hearing, the examiner issued a decision in June 2011 denying the Neighbors' appeal of City staff's decision to grant preliminary plat approval. The Neighbors filed a petition in Clark County Superior Court under the Land Use Petition Act[10] for review of the examiner's decision. The superior court affirmed that decision. The Neighbors timely appeal.

## ANALYSIS

### I. AMENDMENT TO THE COVENANTS

The Neighbors argue that the trial court erred when it ruled on summary judgment that the 2008 amendment to the Covenants was invalid. The Andersons maintain that the trial court's ruling was correct because the Neighbors failed to muster the 80 percent vote required to amend the Covenants. In light of the ambiguity in the Covenants' language that allows amendment, we look to the Covenants document in its entirety and to surrounding circumstances to interpret this language. The intent of the Covenants was to make voting rights directly proportionate to ownership of the original 13 lots. Therefore we conclude that a one-half vote should be allocated to each of the two lots within former lot 13. As a result, the 2008 amendment is valid, having received 10.5 of 13—or 80.7 percent—of the votes.

We review de novo a ruling granting summary judgment. *Green v. Normandy Park Riviera Section Cmty. Club, Inc.*, 137 Wn. App. 665, 681, 151 P.3d 1038 (2007). Interpreting a covenant's language is a question of law. *Green*, 137 Wn. App. at 681. Courts do not strictly construe covenants but, instead, look to the purpose a covenant seeks to accomplish to determine

---

[10] Ch. 36.70C RCW.

9

the covenant's intent. *Fawn Lake Maint. Comm'n v. Abers*, 149 Wn. App. 318, 324, 202 P.3d 1019 (2009). Three rules in particular govern the court's interpretation of covenants:

> (1) The primary objective is to determine the intent of the parties to the agreement, and, in determining intent, clear and unambiguous language will be given its manifest meaning. (2) Restrictions, being in derogation of the common-law right to use land for all lawful purposes, will not be extended by implication to include any use not clearly expressed. Doubts must be resolved in favor of the free use of land. (3) The instrument must be considered in its entirety, and surrounding circumstances are to be taken into consideration when the meaning is doubtful.

*Burton v. Douglas County*, 65 Wn.2d 619, 621-22, 399 P.2d 68 (1965) (citations omitted). In this case, the second rule does not apply because we are determining how the voting rights of lot owners should be allocated under the Covenants; we are not determining whether the restriction against subdivision on which the lot owners voted was substantively invalid. The Andersons make no argument that the restriction, if properly enacted, was substantively invalid.

Whether the 2008 amendment to the Covenants is valid, then, hinges on how votes are allocated among the lot owners. Again, the Covenants' language allowing amendment states: "[A]ny modification desired may be made by affirmative vote of 80% of the then owners of lots within this subdivision and evidenced by a suitable instrument filed for public record." CP at 16. "[C]onsistent with the original intention to restrict the ownership in Rivershore to 13 single-family dwelling lots," the Neighbors propose that the total number of votes is 13, even though the result of Brown's short-platting lot 13 was 14 lots within Rivershore. Appellants' Br. at 18. Whereas the respective owners of lots 1 through 12 each have a full vote, each owner of the two smaller lots created from former lot 13 should be given a one-half vote. Allocating the votes in this way means that 10.5 of 13—or 80.7 percent—of the votes were cast in favor of the amendment, and so the amendment was valid.

The Andersons counter that the trial court properly allocated one full vote to each of the 14 lots within Rivershore in determining whether the amendment had been enacted by a sufficient percentage of votes. Allocating the votes in this way means that 11 of 14—or 78.5 percent—of the votes were cast in favor of the amendment, and so the amendment was not adopted. The Andersons point out that any amendment to the Covenants must be enacted according to the amendment language set forth in the Covenants. The Andersons read this language to mean that "[v]oting rights extend to all 'owners of lots' within the subdivision," and nothing in the Covenants or plat supports treating each of the two lots within former lot 13 as half of a lot for voting purposes. Resp'ts' Br. at 13.

Additionally, the Andersons ask us to disregard the Neighbors' proposed manner of allocating votes because the Neighbors have not provided any supporting authority for that proposal. But the Andersons themselves have provided no authority for their contention that each of the 14 lot owners should be entitled to one full vote; they simply refer us to the Covenants' language concerning amendment as supposedly clear evidence of a "one lot-one vote" rule. Resp'ts' Br. at 14. And yet the Andersons also admit an ambiguity in the language exists when they point out that "[t]here is nothing in the covenants or the plat . . . determining what constitutes a 'lot'." Resp'ts' Br. at 14.

Indeed, "lot" is never defined in the Covenants, nor do the Covenants provide any other express clarification on how votes are to be allocated among "then owners of lots within this subdivision." CP at 16. In addressing the lack of authority provided on this issue, the Neighbors rightly emphasize that "[t]his is a very fact-specific situation." Appellants' Reply Br. at 8. Thus, to determine how to allocate votes under the Covenants, we must determine the Covenants' creator's intent by considering the entire document and the surrounding circumstances.

11

By their own terms, the original Covenants do not directly address the future division of lots within Rivershore. And because we will not imply a restriction in the Covenants against lawful subdivision of one's own land where the Covenants do not expressly prohibit such an activity, the original Covenants do not prevent the Andersons—or any of the other Neighbors—from subdividing their lots. But affirming the trial court on this point does not determine the voting rights of any newly created lots.

We have closely examined Rivershore's plat and Covenants for any indication of the creators' intent about how to allocate voting rights after division of a lot within Rivershore. But because it appears that the creators did not anticipate divisions of the original lots, any specific intent regarding voting rights following such divisions is simply lacking. For instance, both the plat in note 4 and the Covenants in section 15 grant an undivided 1/13th interest in Tract A to the respective owners of lots 1 through 13. Granting a specific 1/13th interest in this tract of tidelands, as opposed to a general right to use the tidelands as a common area, strongly suggests that Rivershore's creators did not anticipate that any additional lot would be added to Rivershore. Furthermore, section 16 of the Covenants reads, "It is intended that the use and enjoyment of said Parcel 'A' [Tract A] be restricted to the owners of Lots 1 through 13 and the future owners of lots contained within the boundaries of Tax Parcels 122364, 122365 and 500742." CP at 19. These tax parcels refer to other subdivisions outside Rivershore.[11] If the Covenants' creators had intended future additional lots within Rivershore, it seems likely that the obvious question of what rights these lots' owners would have in Tract A would have been addressed, just as the

---

[11] The Andersons posited at oral argument that reference to these tax parcels was to land within Rivershore. Because these parcels are outside Rivershore, it appears that the intent was that lots in future plats adjacent to Rivershore would also have rights in Rivershore's tidelands.

Covenants specifically addressed the interests that intended future owners of lots outside Rivershore could have in Tract A.

There is a difference between expectation and intent. The language of the Covenants shows that the creators did not expect that there would be divisions of the lots within Rivershore. But the language does not show that the creators intended that such divisions not be allowed. Because of this difference, we are no closer to resolving how voting rights are to be allocated when a Rivershore lot is divided. We cannot resolve the voting rights issue by using the first *Burton* rule because here the Covenants' language regarding the creators' intent is not clear and unambiguous. Having noted that the second *Burton* rule is inapplicable in this case, we thus turn to the remaining rule looking to the entirety of the Covenants and the surrounding circumstances to resolve this issue.

The entirety of the Covenants supports the notion that voting rights are proportionate to ownership of the original 13 lots. At purchase, each buyer received ownership of a lot and a fractional interest in the tidelands. Each buyer also received certain rights (along with obligations) under the Covenants. One of these rights was the right to vote for or against any proposed amendment to the Covenants. And each original buyer knew that he or she had one vote, or 1/13th of the voting power, to approve or reject a proposed amendment. Thus a lot owner knew that if he or she could find two other like-minded lot owners, together they could stop an amendment to the Covenants. A lot owner also knew that if he or she could find ten other supporters for an amendment, together they could pass it. We see no reason to think that the Covenants' creators (or the buyers of the original lots for that matter) would have expected that the proportionate voting calculus would change if a lot was further divided. But under the Andersons' theory, a lot owner now needs the support of eleven other lot owners to pass an

amendment and only two other owners to stop one. This allocation of voting power is clearly inconsistent with the rights each individual lot owner received upon buying an original lot, and thus it is inconsistent with the creators' intent on how to apportion votes. The Covenants' original and continuing intent is that voting rights are to be directly proportionate to ownership of the original 13 lots. It would be inconsistent with this intent to allow a lot owner to increase their (and their successor's) proportionate voting rights by the simple expedient of subdivision.

Surrounding circumstances support this interpretation as well. Notably, when Brown subdivided lot 13, the two resulting lots each received a 1/26th interest in Tract A—that is, the 1/13th interest that lot 13 had in Tract A was divided equally between the two new lots. It seems reasonable to also apportion between these two lots the one vote that lot 13 had rather than to create two votes out of one. Dividing the vote would make the voting power of each of the two new lots commensurate with the interest each lot has in Tract A.

We hold that each of the two lots within former lot 13 has a one-half vote for purposes of amending the Covenants, and thus the 2008 amendment to the Covenants was approved by an 80.7 percent vote. The trial court's ruling that the amendment was invalid is reversed.

II.    THE ANDERSONS' EQUITABLE CLAIMS

The Andersons next argue that they are alternately entitled to declaratory relief on the equitable grounds that the Neighbors were estopped from asserting their claims against the Andersons. The trial court denied the Andersons' summary relief on this issue, noting that there was insufficient evidence and a material issue of fact. Equitable estoppel is a factual issue unless only one reasonable inference can be drawn from the evidence. *Shows v. Pemberton*, 73 Wn. App. 107, 111, 868 P.2d 164 (1994). Because the evidence regarding estoppel is underdeveloped in this case, we affirm the trial court's denial of summary judgment for the

14

Andersons on this issue and remand for further proceedings. The Andersons' success on this issue would permit them to move forward with an application to subdivide lot 2 despite the valid Covenant amendment prohibiting further division of lots within Rivershore. Because the issue of whether that application should be processed as a short plat or as a plat alteration is not ripe, we reserve ruling on that issue. We retain jurisdiction, however, to decide that issue if the Andersons are successful with their estoppel argument. The parties shall promptly advise us of any final ruling on the estoppel issue by the trial court, at which time we will determine the need for an additional briefing.

III. ATTORNEY FEES SHOULD NOT BE AWARDED

In connection with the trial court's declaratory judgment, the Andersons argue that the trial court erred by denying their request for attorney fees and costs. On appeal, both the Andersons and the Neighbors request attorney fees under RAP 18.1 and section 19 of the Covenants if they are the prevailing party. An attorney fee award must be authorized by contract, statute, or equitable grounds. *City of Sequim v. Malkasian*, 157 Wn.2d 251, 271, 138 P.3d 943 (2006) (quoting *Bowles v. Dep't of Ret. Sys.*, 121 Wn.2d 52, 70, 847 P.2d 440 (1993)). When a contract provides that attorney fees and costs shall be awarded to one of the parties, "the prevailing party . . . shall be entitled to reasonable attorneys' fees in addition to costs and necessary disbursements." RCW 4.84.330.

Within the muddled language of section 19, the Covenants—a contract between the Rivershore lot owners—appear to provide reasonable attorney fees for any party successful in enforcing the Covenants or restraining their violation. Under RCW 4.84.330, the court may award these attorney fees to the party that prevails on this action under the Covenants. But here, neither party is the prevailing party; the outcome of this case still depends on whether the

15

Andersons prevail on their equitable claims on remand (and, if they do, whether they are then able to proceed with their short plat application to divide lot 2). Accordingly, we affirm the trial court's ruling denying the Andersons' request for attorney fees and similarly decline to award attorney fees to either party on appeal.

We reverse in part, and remand with jurisdiction retained.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Penoyar, J.

We concur:

Hunt, P.J.

Bjorgen, J.

16